## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **8:07CR83** |
| vs. | ) | |
| | ) | **REPORT AND** |
| MARK MEHNER, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's "MOTION TO SUPPRESS EVIDENCE OBTAINED AS RESULT OF FIFTH AMENDMENT VIOLATIONS" (Doc. 58).  An evidentiary hearing was conducted on June 5 and June 12, 2008, the transcripts of which were filed on July 7 and July 8, 2008 (Docs. 75 & 76).  The final post-hearing brief was filed on August 13, 2008, at which time the motion was deemed submitted.

For the reasons discussed below, I recommend that the motion be denied.

## I. INTRODUCTION

The defendant ("Mehner") is charged with two counts of wire fraud and two counts of bank fraud.  The charges involve an alleged scheme to defraud Zion Lutheran Church ("Zion Lutheran").  Zion Lutheran filed suit against Mehner in the Douglas County District Court (the "civil action") on February 23, 2006.  (Ex. 101).  Mehner, proceeding without counsel, was deposed twice by Zion Lutheran's attorneys.  Mehner now contends that all documents and photographs obtained through discovery in the civil action should be suppressed because there was a parallel criminal investigation pending, and the government

did not notify him of the active criminal investigation while the civil action was pending. Mehner further contends that all deposition testimony he gave in the civil action should be suppressed because "it is violative of [his] Fifth Amendment right against self-incrimination and rights of Due Process."

In summary, Mehner contends the United States Attorney's Office violated his constitutional rights and "departed from the proper administration of justice" by failing to disclose the existence of a parallel criminal proceeding while obtaining information through the civil action filed by Zion Lutheran Church.  (Doc. 59 at p. 5/13).  Mehner also suggests that agents of the federal government actually caused the civil action to be filed for purposes of obtaining evidence for use against Mehner in this criminal action.  Considering the serious nature of these allegations, the defendant was ordered to file a post-hearing brief including (1) citations involving privately-filed civil cases with parallel federal or state criminal cases, and (2) "pinpoint citations to the record, to each and everything that the defendant believes the record shows as to the allegations that the defendant has made in this case."  (Doc. 76 at p. 38/41, 136:3-7).

## II. SCOPE OF INQUIRY

In general, the Fifth Amendment to the Constitution of the United States restrains action by the government, not action by a private party.  However, if a private party acts as an instrument or agent of the government in committing constitutional violations, the acts of

-2-

the private party may be imputed to the government.  *See, e.g., United States v. Graham*, 2003 WL 23198793, No. 03-CR-089 (D. Colo., Dec. 2, 2003).

"The sole concern of the Fifth Amendment ... is governmental coercion.... Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'  ...  The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citations omitted).  Any impropriety in taking Mehner's deposition in the civil action will require suppression under the Fifth Amendment only if the plaintiff's conduct in that matter may be imputed to the government.  If no government official had any connection with the deposition or any knowledge of misconduct in taking the deposition until after the fact, then the deposition is admissible in this criminal proceeding. *United States v. Handley*, 763 F.2d 1401, 1404 (11th Cir.), *cert. denied*, 474 U.S. 95 (1985).

Thus, the court's actual inquiry in this matter must be directed toward determining whether the actions taken by Zion Lutheran Church and its attorneys in the civil action were made as agents, or at the direction, of the government. *See United States v. White*, 846 F.2d 678, 689 (11th Cir.), *cert. denied*, 488 U.S. 984 (1988).

### III.  FACTUAL BACKGROUND

Pastor Thomas Schmitt testified that he became acquainted with Mark Mehner in 1997 or 1998 in his capacity as a pastor at Zion Lutheran.  During 2004, Mehner was the president

-3-

of the congregation.  In that capacity, in the latter part of 2004, Mehner approached Schmitt and members of the church about a member of the congregation wishing to make an anonymous donation of property.

The initial 10 acres of property was worth $1.2 million to $2 million.  There were additional acreages, to total 100 acres at one point in time, and that total worth was thought to be about $5 million.  The church was then told that of the remaining 90 acres, only 60 were habitable due to wetland issues.  According to Pastor Schmitt, there were many stories presented, which led the church to pose questions in late 2005 and in 2006 about certain transactions related to the donation.

After Mehner first proposed this donation, the church took out a loan with the Bank of Bennington in the amount of $250,000.  Pastor Schmitt testified the church understood that it was participating in a bargain sale to charity and was purchasing from the donor family the basis in their land, which would be immediately flipped to a developer for $1.2 million. The donor was to recover the basis in the land, and it was represented to the church that the donor had a $250,000 basis for the donor's purchase price and improvements.  The land deal has never come to fruition for the church.

Mehner and members of the church exchanged correspondence and e-mails about this donation; however, Pastor Schmitt did not recall ever seeing an e-mail from Mehner dated January 11, 2006 (Ex. 108).  By January 11, 2006, the donation was in a state of flux, and the church requested Mehner to present to the congregation that next Sunday about where they

-4-

stood.  For example, the church was being billed for closings and expected to have land, but were told they did not have land, and did not understand why the church was paying for closings.  Various options were discussed.  One of the proposed solutions was that the proposed donor would pay back to the church or the congregation the expenses and would service the note until the donation was realized.

On January 19, 2006, Pastor Schmitt was contacted by Omaha Police Detective Dean Miller and U.S. Secret Service Special Agent Matt Loux.  He did not realize they intended to talk to him about some fraud related to the church.  They asked about the status of a $250,000 loan the congregation had given to Mehner.  Schmitt told the officers that the church did not give Mehner any money; rather, he was orchestrating a land deal with a member of the congregation.  The officers suggested that that might  not be the case and the church might want to get a lawyer to make sure that what they had been told was true.  They did not actually state that this was a fraudulent activity, but that it might be a good idea to get a lawyer.  The officers said they would appreciate it if Schmitt did not say anything to anybody about this, because Mehner did not know he was under investigation.

Pastor Schmitt met with defendant Mehner on January 20, 2006.  Mehner had called him the evening of January 19th, just a couple hours after the officers left, and said he had some good news about the land deal.  Mehner wanted to talk to Schmitt the next morning at the church.  At the last minute Mehner called and changed the location to a nearby restaurant.

-5-

Prior to meeting with Mehner, Pastor Schmitt phoned Detective Miller about the upcoming meeting. Miller did not instruct Schmitt to not disclose his conversations with the officers, but just to listen to what Mehner had to say and not give him any money. Nor did Miller ask Schmitt to ask any particular questions of Mehner or to wear a wire.

Pastor Schmitt testified that when he met with Mehner on January 20, 2006, Mehner already knew that he was being investigated by the police. Mehner said his real estate dealings were all being investigated and that he was very pleased they had found nothing in any of his dealings; however, Mehner was very upset because he thought a member of the congregation had initiated the criminal investigation. Mehner asked Schmitt whether he was aware that a member of the congregation had initiated an investigation into Mehner's real estate transactions. Schmitt answered that he was not. He was not specifically asked whether he himself had talked to Detective Miller, and he asked Mehner for the spelling of Miller's name to deflect any suspicion that he had already been contacted by the police. Mehner wanted Pastor Schmitt to find out who from the congregation had contacted Detective Dean Miller. If he did not find out and report to Mehner who had initiated the police investigation, Mehner would have to sue the entire congregation for defamation of character and slander. Mr. Bruce Goodwin, introduced by Mehner as the attorney for the donor/seller, was present at the January 20, 2006 meeting. To Schmitt, the whole point of the January 20, 2006 meeting was not for Mehner to offer anything to the congregation, but

to bully the church into working for him to find out who was initiating these charges under threat of lawsuit against the congregation.

Schmitt did contact the police department after his January 20, 2006 meeting with Mehner to make sure that the visit from Agent Loux and Detective Miller was legitimate. He told Miller about the meeting with Mehner and Goodwin. Miller responded that it did not matter whether Schmitt told Mehner about their initial conversation, as Mehner definitely knew he was under investigation.

The church retained counsel on Monday, January 23, 2006. According to Pastor Schmitt, the church simply wanted their attorney to have Mehner verify that what he had told the church was true. The civil action was filed because Mehner did not respond to their requests for information.

Mehner had floated numerous offers for the church's consideration. Although there may have been some discussion of exercising an option for the church to receive back its earlier investment (*see* Ex. 108), that offer was never formally made. There was no unconditional offer for Mehner to return the $250,000. Pastor Schmitt explained that Mehner had represented himself as going between the church and the donor family. Towards the end, Mehner indicated he was no longer in contact with the donor/seller, and the donor/seller had requested that he only talk to the donor/seller's attorney. According to Pastor Schmitt, nobody connected with law enforcement ever told him not to take a settlement from defendant Mehner or to do anything in particular with respect to defendant Mehner.

Attorneys Jeffrey B. Farnham and Michael F. Scahill represented Zion Lutheran Church in the civil litigation.  Mr. Farnham testified that he filed the lawsuit on February 23, 2006 seeking to recover over $250,000 that the church had given to the defendant.  Mehner was deposed in the civil action in March and May 2006.  According to Farnham, the church wanted to determine what had happened with the money it had advanced to Mehner.

Farnham met with Agent Loux and Detective Miller During the course of his representation of Zion Lutheran,.  He met with Agent Loux before Mehner's first deposition.  Neither officer asked Farnham to take any action on behalf of their investigation or to ask specific questions of Mehner at his deposition.

Mr. Scahill testified that he had no meetings or conversations with Agent Loux other than in preparation for the June 5, 2008 hearing on Mehner's Motion to Suppress.  He may have spoken to Detective Miller on the telephone once.

Messrs. Farnham and Scahill both testified that neither Agent Loux nor Detective Miller asked or directed them not to make a settlement with Mehner in the civil action.

On August 21, 2006, Zion Lutheran Church obtained a summary judgment on its civil claims for conversion and fraudulent misrepresentation in the amount of $291,515.74.  The summary judgment did not resolve all the claims originally asserted in the civil action.

Detective Miller testified that he first became familiar with defendant Mehner when Wells Fargo Bank Investigator Brian Forkey contacted him with information that Wells

Fargo lost approximately $145,000 in a check kiting scheme involving a Mehner family trust account.  Miller contacted Agent Loux to help investigate these allegations.

Detective Miller met with Aslan Development representative Brian Troia on January 17, 2006 and with Mehner's former employee, Amy Mason, on January 19, 2006.  According to Miller, these meetings had nothing to do with any matter involving the Zion Lutheran Church.

Brian Troia testified that he was visited by Agent Loux and Detective Miller in January 2006.  It was a casual meeting.  According to Troia, the officers indicated Mehner stole money from his parents, was involved with a bunch of fraudulent land deals, and had a previous record of check kiting.  They asked Troia a few questions about Troia's business with Mehner, and then gave Troia information about who Mehner was and what he was doing.  Mr. Troia testified that the officers did not ask him to initiate any conversations with Mehner, but asked him to wear a wire.  He told them he didn't feel right about that.

According to Troia, the officers asked him to give them a little time and not to discuss the meeting with Mark Mehner.  Troia had several meetings and conversations with Loux and Miller.  During their conversations, there was never anything mentioned about a church being involved.

Between three weeks and two months after the January 2006 meeting, Troia gave the officers documentation supporting his open transactions with Mark Mehner.  Agent Loux called and said that everything looked good and Troia was free to go about his business.

-9-

Loux did specifically mention that Troia could now talk to Mark Mehner. At that point in time, law enforcement had not disclosed anything about a church to Mr. Troia. Troia did talk to Mehner about the police investigators because he wanted to know what was going on.

Amy Mason testified that she first met with Agent Loux and Detective Miller in January 2006. They asked what her relationship was with Mr. Mehner, and specifically about the VLN Family Trust. The officers did not mention anything to her about a church. They specifically asked about the trust account, how she met Mehner, and a land transaction in Arizona. Agent Loux told her not to discuss this meeting with Mark Mehner; however, Mason testified she did not honor that direction from Agent Loux and did talk to Mark Mehner about being interviewed. Mason contacted Mehner the same day or the day after and said she had been visited by Loux and Miller. Mehner asked what they wanted, and she told him they were asking about the VLN Family Trust and its checking account. She was the initial trustee of that trust, which was opened with a $100 deposit. Shortly thereafter, a large amount of money was deposited into the trust account from a single check.[1] Mason testified she did not know the source of the check. She did not recall the officers asking her anything about insufficient fund checks or check kiting.

Detective Miller testified he also met with Pastor Schmitt on January 19, 2006 regarding the check kiting complaint. By that time Miller had developed a sense that there might be some sort of a civil fraud committed by Mehner against Zion Lutheran. Pastor

---

[1] The creation of the VLN Family Trust is discussed in the February 27, 2008 Report and Recommendation, Filing 39 at p. 3/13.

Schmitt asked what the church should do about contacting an attorney.  Miller testified he responded that it would be up to the organization to decide whether they would like to speak to an attorney.

Further into his investigation, Detective Miller received a telephone call from Jeff Farnham, who was representing Zion Lutheran.  Farnham said they were considering a civil suit and a possible criminal complaint by Zion Lutheran against Mark Mehner.  Farnham had contacted Miller because he knew Miller had actually spoken to Pastor Schmitt about defendant Mehner.  Miller advised Farnham to speak with the Assistant U.S. Attorney to obtain more information.  He did not suggest that Mr. Farnham or Zion Lutheran take any particular course of action with filing a lawsuit or interviewing witnesses.  Nor did he ever suggest to Pastor Schmitt or Zion Lutheran that they not settle or attempt to settle their disputes with Mehner.

Around February 1, 2006, Agent Loux assumed the role of primary investigator in this matter.  Loux testified that he first became aware of Mark Mehner in December 2005.  While discussing an unrelated case with Wells Fargo Bank Investigator Brian Forkey, Forkey mentioned he had a check kiting case involving Mehner, which he had reported to Detective Dean Miller of the Omaha Police Department.  Forkey also e-mailed Loux a copy of his report because he knew Loux and Miller often worked together.

Agent Loux testified that he contacted Brian Troia on January 31, 2007.  Loux was not present when Miller contacted Brian Troia on January 17, 2007.  He was with Miller

during the January 19, 2007 meeting with Amy Mason. At that time, he and Miller were investigating Brian Forkey's complaint of the possible check kiting scheme. After interviewing Amy Mason, Miller and Loux spoke with Pastor Schmitt about the initial $250,000 check. Pastor Schmitt explained to them that the check was for a land deal from an anonymous donor.

Agent Loux testified that he was aware that Zion Lutheran hired attorneys Farnham and Scahill, and that Zion Lutheran had filed the civil action against Mehner to recover the original $250,000 and other money the church had advanced to Mehner. Agent Loux had spoken to Mr. Farnham, but not Mr. Scahill. He testified that he did not ever ask Farnham to follow any particular course of action in the civil action against Mehner. Agent Loux did obtain copies of Mehner's depositions from Mr. Farnham. Loux testified he was contacted by Farnham in about February 2007, at which time Farnham asked how the federal investigation was going and asked if Loux wanted copies of anything. After consulting the Assistant U.S. Attorney, Loux told Farnham he would look at the documents if Farnham was willing to give them to the investigators. Loux had initially received the deposition transcripts without exhibits. *See* Ex. 111. He later requested the exhibits because the deposition testimony did not make sense without them; however, he had already obtained all the exhibit documents through federal grand jury subpoenas. Loux denied ever suggesting to Zion Lutheran or its attorneys that they not try to settle the dispute with Mehner.

-12-

Detective Miller and Agent Loux both acknowledged participating in executing a writ of entry to defendant Mehner's property on or about February 26, 2007. They entered the residence, took an inventory, and made a videotape showing how it looked inside and demonstrating that the officers did not damage anything.

Loux testified on cross-examination that he and Miller met with Doyle Koch and bank president Leslie Andersen at the Bank of Bennington on January 13, 2006 regarding the information they had received from Wells Fargo and Omaha State Bank. A trust account at Omaha State Bank was opened with a $250,000 check that Zion Lutheran had obtained through a loan at the Bank of Bennington. Omaha State Bank had prepared a SAR in December 2005. Loux and Miller wanted to find out if the $250,000 check was a legitimate check. Mr. Koch told the investigators why the check was in the account. The officers obtained other relevant documents and information from the banks by subpoena. Loux denied that he instructed or encouraged the Bank of Bennington to prepare a SAR regarding the $250,000 check.

It is undisputed that the U.S. Attorney's Office did not ever send a "target letter" to defendant Mehner.

## IV. DISCUSSION

"[T]he government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise departing from proper standards in administering justice." *United States v. Posada Carriles*, 2008 WL 3522422 at *8, No. 07-

-13-

50737 (5th Cir., Aug. 14, 2008) (citing *United States v. Kordel*, 397 U.S. 1, 11-12 (1970)). If the civil action in question was not filed by the government, then the defendant bears the burden of demonstrating that the civil proceeding was essentially a pretext for a criminal investigation. *See United States v. Posada Carriles*, 2008 WL 3522422 at *9.

In this case, law enforcement approached the pastor of Zion Lutheran while investigating a check kiting complaint made by Wells Fargo Bank. Zion Lutheran and its attorneys wished to, and did, cooperate with the investigating officers; however, the record does not support the conclusion that any aspect of the civil action was instigated, planned, orchestrated, or controlled by an agent of the government. There was no agency relationship between law enforcement and the representatives of Zion Lutheran.

Even assuming that the sole motive of the church and its representatives was to help indict Mark Mehner, such behavior may not be imputed to the government for the purposes of suppression under the Fifth Amendment. *See United States v. White*, 846 F.2d at 689. "The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible" in a criminal proceeding. *Colorado v. Connelly*, 479 U.S. at 166. The court finds that Zion Lutheran Church, its pastor, and its attorneys were acting as private citizens in prosecuting the civil action. The civil case was a viable action in which the church sought information from Mehner regarding the alleged land transaction and repayment of the money the church expended in trying to complete the transaction. The behavior of the church's agents may not be imputed to the government in

-14-

this instance.  Their motives or tactics are irrelevant to the question whether the government

may use the evidence obtained by the church in the civil action.  *See United States v. White*,

846 F.2d at 689.

The defendant concedes in his post-hearing brief (*see* Filing 77 at p.1/23) that he was

unable to find any case law in which a court suppressed evidence obtained in a parallel civil

case which was prosecuted by privately retained attorneys.  There is authority to the contrary.

In *United States v. Handley* and its companion case, *United States v. White*, the Eleventh

Circuit held that evidence procured in a civil matter by privately retained attorneys was

admissible in a criminal prosecution.  In comparison, if the government wants to use

statements made during a custodial interrogation, the government must prove that the

statements were given voluntarily.

> The reasoning behind this rule is that, "without proper safeguards the
> circumstances of custodial interrogation deny an individual the ability freely
> to choose to remain silent ... [A]ny pressures inherent in custodial interrogation
> are compulsions to incriminate, not merely compulsions to make unprivileged
> disclosures."  [*Garner v. United States*, 424 U.S. 648, 657 (1976)].  A
> defendant in custody must knowingly and voluntarily waive his Fifth
> Amendment privilege.
>
> The same concerns do not exist when interrogation does not occur in
> custody.  In a non-custodial interrogation, "an individual may lose the benefit
> of the privilege without making a knowing and intelligent waiver."  *Id*. at 654
> n.9; *Minnesota v. Murphy*, 465 U.S. 420, 428 (1983).  Therefore, in this case,
> no justification exists for requiring the Government to bear the burden of
> proving that the defendants voluntarily waived their Fifth Amendment
> protections.  None of the defendants was in custody at the time that any of the
> suppressed statements was made.  None of the depositions was conducted so
> as to restrain the defendants, and no government officials were present.  Even
> though the deponents were "compelled" by subpoena to appear and give

depositions in the SPLC's civil action, the Government's use of any disclosures made by the defendants does not violate the Fifth Amendment. Where the witness fails to claim the privilege, "the government has not 'compelled' him to incriminate himself." *Murphy*, 465 U.S. at 427(quoting *Garner*, 424 U.S. at 654). Accordingly, the district court erred in requiring the Government to demonstrate that the defendants knowingly waived their Fifth Amendment privileges with respect to the suppressed statements.

*United States v. White*, 846 F.2d at 689-90 (parallel citations omitted). The court also observed that it is a settled principle that a witness must assert his Fifth Amendment rights. "A witness who testifies at any proceeding, instead of asserting his Fifth Amendment rights, loses the privilege.... A civil deponent cannot choose to answer questions with the expectation of later asserting the Fifth Amendment." *United States v. White*, 946 F.2d at 690.

The record strongly suggests that defendant Mehner was aware of the criminal investigation by the time he was deposed. Amy Mason told him she had been interviewed by the police. The day after Mason was interviewed, Mehner and Mr. Goodwin met with Pastor Schmitt, demanded to know who from the congregation had contacted Detective Dean Miller, and threatened to sue the church and its congregation for slander and defamation of character.

## V. CONCLUSION

The court finds that Zion Lutheran Church was not acting as an agent of the government in pursuing the civil action against Mark Mehner. There was no agency relationship between law enforcement and the representatives of Zion Lutheran. This is not a case in which the government brought a civil action solely to obtain evidence for its

-16-

criminal prosecution or failed to advise the defendant in its own civil proceeding that it contemplated his criminal prosecution.  The evidence in question was procured by a private party, no agent of the government violated the defendant's fifth amendment rights, and the documents and photographs obtained through discovery in the civil action should not be suppressed in this criminal proceeding.  Accordingly,

**IT IS RECOMMENDED** that defendant's "MOTION TO SUPPRESS EVIDENCE OBTAINED AS RESULT OF FIFTH AMENDMENT VIOLATIONS" (Doc. 58) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation  by filing an "Objection to Report and Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED August 26, 2008.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**